Argued and submitted November 18, 1988, judgment modified on appeal, otherwise affirmed; affirmed on cross-appeal; appellant's motion to substitute a party granted; respondent's motion for leave to file motion for new trial denied August 30, 1989, reconsideration denied January 12, petition for review pending 1990

In the Matter of the Marriage of

LEATHERS,
*Appellant - Cross-Respondent,*
*and*

LEATHERS,
*Respondent - Cross-Appellant.*

(86-1-371; CA A46768)

779 P2d 619

Charles F. Adams, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were James R. Cartwright, and Stoel Rives Boley Jones & Grey, Portland.

Lee Aronson, Portland, argued the cause for respondent - cross-appellant. With him on the brief were William F. Schulte, Jr., and Schulte, Anderson, DeFranco, Downes & Carter, P.C., Portland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

DEITS, J.

**DEITS, J.**

In this dissolution proceeding, husband[1] appeals the trial court's distribution of marital property, arguing that the court failed to give proper effect to an antenuptial agreement and improperly awarded wife an interest in post-separation profits that he earned. Wife cross-appeals, arguing that the court should have voided the antenuptial agreement altogether. On *de novo* review, we affirm in part and reverse in part on the appeal and affirm on the cross-appeal.

The parties' 22-year-marriage was dissolved by a dissolution judgment entered January 3, 1988. Before their marriage, the parties entered into an antenuptial agreement, the pertinent portions of which are:

"1. It is understood and agreed that [wife] has, as of the date of this instrument, cash and assets in the sum of [$6,000]. It is further understood and agreed that [husband] has earned and accumulated over the years prior to this agreement substantial assets, holdings and interest in real and personal property principally through his efforts and business endeavors in the marketing of petroleum products.

"2. It is the intention of this agreement that, in the event of a termination of the contemplated marriage by a decree of divorce, the distribution of assets in such event shall be in accordance with the terms and provisions of this agreement, and that [husband] shall convey, transfer and pay over to [wife] the following assets:

"(a) The accumulated equity of the parties in their home property;

"(b) A sum equal to the aforementioned sum of [$6,000] as the return to [wife] of the value of assets she owned as of the date of this agreement;

"(c) The family automobile, free and clear. If there should be more than one family automobile at the time of such termination of this marriage, it is understood and agreed that [wife] shall receive the automobile of her choice, free and clear;

"(d) The household furniture and furnishing owned by or being purchased by the parties and used by them in their family residence, free and clear.

---

[1] Appellant's motion to substitute the personal representative as a party is granted.

"3. It is specifically understood and agreed that the aforementioned assets constitute a full and fair settlement of the rights and claims of [wife] in the event of a termination of the contemplated marriage, and that said assets shall be the sum total of [wife's] claim against [husband], and that upon conveyance, transfer and payment by [husband] to [wife] of said assets and sums, all obligation of [husband] arising from the marital relationship shall cease and determine.

"* * * * *

"7. [Wife] hereby waives, disclaims and releases all right, title and interest in and to any and all real and personal property owned or possessed by [husband] at the time of their marriage, save and except the interest of [husband] in [his home property], or that he may hereafter acquire by any means whatsoever, save and except the subsequent purchase or acquisition of any real property which shall be used by the parties as their home property."

After the parties married, wife began working full time in husband's business, Leathers Oil Company. She drew no salary for her work, but both parties used company accounts to pay their personal expenses. Husband testified at trial that he considered wife to be the head of the office when he was away on business. Several employes of the company testified that it was their impression that the parties were operating the business together. Throughout the marriage, most of the properties purchased for Leathers Oil were purchased in the names of both parties. Two years after the marriage, wife asked husband why her name was not on one of the properties being purchased for the company, and husband responded that it was because she was part of Leathers Oil Company and title was being taken in the company's name. Approximately four years after the marriage, apparently at the time for renewal of the company's assumed business name registration, the name of the company was changed from Carl Leathers, dba Leathers Oil Company, a sole proprietorship, to Carl and Lila Leathers, dba Leathers Oil Company, a proprietorship of husband and wife.

The parties' business enterprise expanded rapidly during the marriage, with its total net worth growing from approximately $430,000 at the date of marriage to over $12 million at the date of the dissolution judgment. As of the date

of dissolution, the properties owned by the parties fell into five categories:

> I. Property purchased by husband in his own name before the marriage;

> II. Property purchased by husband in the name of "Carl Leathers, dba Leathers Oil," before the marriage.

> III. Property purchased by husband in the name of "Carl Leathers, dba Leathers Oil," after the marriage but before Leathers Oil was changed from a sole proprietorship to a proprietorship of husband and wife.

> IV. Property purchased by husband in the name of "Carl Leathers, dba Leathers Oil," after Leathers Oil was changed to a proprietorship of husband and wife but before the dissolution.

> V. Property purchased jointly by husband and wife during the marriage in the name of "Carl and Lila Leathers, dba Leathers Oil," or "Carl and Lila Leathers, husband and wife," or "Carl and Lila Leathers, tenants by the entirety."

The trial court first tried the validity and effect of the antenuptial agreement, then tried the dissolution matters.[2] In the first trial, it held that the agreement was valid but concluded that it did not apply to any properties purchased jointly (category V) or to properties purchased in the name of Leathers Oil Company (categories II, III, and IV). In the second trial, it imposed a trust on all Leathers Oil Company properties and awarded wife an undivided one-half interest in all such properties, regardless of the date of purchase, the manner of taking title or the state of individual titles. However, the court also held that wife was not entitled to any interest in

---

[2] The court granted husband's motion for a bifurcated trial on the theory that, if it had determined that the antenuptial agreement was valid and applied to all marital property, it would be unnecessary for the parties to conduct extensive pretrial discovery regarding the specific values of that property. Although the court made oral findings from the bench following the first trial, no final written judgment was entered regarding the validity and effect of the antenuptial agreement until after the second trial.

properties held individually by husband before the date of marriage (category I). Both parties appeal.[3]

We first consider wife's cross-appeal challenging the validity of the antenuptial agreement. Wife argues that the agreement is invalid because: 1) she was not given an adequate opportunity to seek independent counsel regarding the effect of the agreement before signing it; and 2) there was no "meeting of the minds" as to the legal effect that the agreement would have. We review *de novo,* ORS 19.125(3), but give deference to the trial court's opportunity to hear and observe the parties and witnesses. *Jewell and Jewell,* 51 Or App 129, 624 P2d 1092, *rev den* 290 Or 853 (1981).

The antenuptial agreement was prepared by husband's attorney, Lock, with whom wife was acquainted. Although the parties had discussed an agreement in general terms over an extended period of time, wife was not presented with the agreement until the evening before the parties flew to Reno to be married. Wife was aware, when she signed the agreement, of the nature and extent of husband's assets. Wife telephoned Lock before she signed the agreement to discuss its legal effect. After Lock explained the agreement, he advised her that she could seek independent legal counsel before signing it. The trial court found that wife was a sophisticated person, capable of understanding the importance of legal documents and, specifically, the impact that an antenuptial agreement could have in the event the marriage were later dissolved. We agree with that determination and conclude that wife understood, at a minimum, that, under the terms of the agreement, she would not be entitled to any interest in property husband held in his own name before the marriage. We hold that the agreement was enforceable.[4]

---

[3] The court also divided the parties' personal property and other assets unrelated to Leathers Oil Company. Except for the valuation of a profit sharing account awarded to wife (discussed *infra,* note 7), neither party assigns error to those divisions.

[4] During the pendency of this appeal, wife filed a motion for leave to file with the trial court a motion for new trial pursuant to ORCP 71B(2). The motion was based on newly discovered evidence that she alleges would have an impact on the validity and effect of the antenuptial agreement. However, the motion was filed more than 19 months after she received notice of the original judgment. Accordingly, the motion was untimely and is, therefore, denied. ORCP 71B(1).

Husband assigns error to the trial court's conclusion that the agreement does not affect the distribution of properties purchased jointly or in the name of Leathers Oil Company. In essence, he argues that paragraph 7 of the agreement precludes wife from asserting any interest in any property acquired by husband in any capacity whatsoever either before or during the marriage, except for the property that wife was to receive pursuant to the agreement in the event that the marriage was dissolved.

Paragraph 7 provides, in pertinent part, that wife "waives * * * all right * * * to any and all real and personal property owned or possessed by [husband] at the time of their marriage * * * or that he may hereafter acquire by any means whatsoever * * *." The trial court held that, notwithstanding the quoted language, wife was entitled to an undivided one-half interest in all Leathers Oil Company properties. The court reached that conclusion on the premise that the parties had operated the company for 22 years as a partnership and that the antenuptial agreement did not affect wife's partnership rights.

■ A partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." ORS 68.110(1). As a general rule, the test for determining the existence of a partnership is whether the parties intended to establish that relationship. *Hill v. Oland,* 61 Or App 85, 89, 655 P2d 1088 (1982). Although holding property in joint tenancy, tenancy in common or tenancy by the entirety does not itself establish a partnership, ORS 68.120(2), such conduct can, when combined with other circumstances, serve as indicia that a partnership exists.

■ In this case, wife worked full time in the business and was considered by husband to be the head of the office in his absence. Husband testified at trial that he could not remember ever purchasing property without first consulting her on the transaction. Employes in the company were of the impression that the parties operated the business together. Wife drew no salary for her work, but rather paid her personal expenses out of a common company account that she held with husband. Throughout most of the marriage, she was registered with the Corporation Commissioner as a co-proprietor in the company. The titles to approximately eighty percent of

the company assets show wife as a joint owner. Under these circumstances, we conclude that Leathers Oil Company was held in partnership by the parties.

■     Under paragraph 7 of the antenuptial agreement, wife waived all interest in "any and all real and personal property owned or possessed by [husband] at the time of their marriage * * * or that he [thereafter acquired] by any means whatsoever." We conclude that that language does not preclude wife from asserting an interest in the company by virtue of her partnership with husband, but rather only precludes her from asserting an interest in husband's undivided one-half interest by virtue of the marriage. The trial court did not err in awarding wife her one-half interest in the company.[5]

■     Husband next assigns error to the trial court's refusal to treat as husband's separate property a profit made on the purchase and subsequent sale of an option to purchase land. He contends that, because the transaction occurred after the parties had separated and was financed through his own funds, the profit was the result of an independent business decision on his part and that he is therefore entitled to enjoy the benefits alone. *See Hering and Hering,* 84 Or App 360, 733 P2d 956, *rev den* 303 Or 534 (1987).

The record reveals that, after the parties separated, husband approached wife concerning a 20-acre parcel of land that he wished to purchase for purposes of building a truck stop. Wife initially agreed to sign papers with husband to finance the project but later refused to be involved in the transaction, because husband would not give her equal control over the development of the property. Husband purchased the option with funds from his profit sharing account, rather than from the company accounts. Because husband was unable to

---

[5] The titles to all but one of the properties that the trial court placed in trust are held either in the name of Leathers Oil Company or jointly in the names of Carl and Lila Leathers. The one property not so held is referred to in the record as the "Hermiston station" and was purchased by husband before the marriage and in his own name. However, the record reveals that that station has always been listed on the Leathers Oil Company books, with income and expenses channeled through Leathers Oil Company. As a general rule, the intention of the parties governs in determining what constitutes partnership property. *Gorger v. Gorger,* 276 Or 267, 279, 555 P2d 1 (1976). We conclude that the parties intended the Hermiston property to be part of Leathers Oil Company and that wife was therefore entitled to an interest in that property as well.

obtain additional financing without wife's signature, the development plans were abandoned and husband sold the option at a profit of $140,000. He deposited the money in the Leathers Oil Company account as a loan.[6] The trial court made no specific findings regarding the transaction, but did award wife one-half interest in all Leathers Oil Company assets, which included the $140,000 profit on the option that he had loaned to the company.

■ In *Rohde and Rohde,* 25 Or App 431, 549 P2d 1132 (1976), we held that it was inappropriate for the trial court to divide the parties' property in a manner that required the husband to bear the brunt of the loss suffered in their ranching venture. We reasoned in that case that, because the ranch was essentially a business venture entered into by the husband and the wife and that, because she would certainly have expected to share in the profits of the venture, if there had been any, it was "only fair that she be required to bear a portion of the loss where the investment proved unwise." 25 Or App at 431. This case presents the precise opposite of *Rohde.* Although their explanations of wife's motives differ, both parties testified at trial that wife refused to participate in the truck-stop project. Husband used his own funds to purchase the option and abandoned the project when wife would not sign for additional financing. Even though he subsequently loaned the money to the company, it remained his asset. The trial court erred in awarding wife a one-half interest in the profit generated by the sale of the option.[7]

Judgment modified on appeal to award the $140,000 profit from option sale to husband; otherwise affirmed; affirmed on cross-appeal; appellant's motion to substitute a party granted; respondent's motion for leave to file a motion for new trial denied. No costs to either party.

---

[6] Although husband deposited the profit in the Leathers Oil Company account, he testified at trial that he only intended to loan the money to the company because it was in financial straits at the time. The trial court specifically found the testimony of both parties to be credible.

[7] Husband also assigns error to the trial court's valuation of wife's profit sharing account, arguing that the value of the account should not have been reduced by the tax consequences that wife would suffer in the event she withdrew the funds. We conclude that the trial court's valuation was consistent with ORS 107.105(2), which authorizes the court to take the tax consequences of a distribution into consideration, and with our holding in *Alexander and Alexander,* 87 Or App 259, 742 P2d 63 (1987). The parties' remaining assignments of error are without merit.